## THE ELEANORE.

### THE J. PIERPONT MORGAN.

#### (Circuit Court of Appeals, Sixth Circuit. January 11, 1918.)

#### No. 2970.

1. COLLISION ⬉153—REVIEW ON APPEAL—FINDINGS OF FACT.
    Where the issues involved only questions of fact, the finding of the District Court, which heard the witnesses in an admiralty case, that a steamer passing through a channel of the Detroit river was not in fault for the sinking of a barge anchored or moored near the edge of the channel, will not be disturbed by the appellate court, if there is material evidence to support it.

2. ADMIRALTY ⬉73—HEARING AND DECISION—LATITUDE OF PROCEDURE—PERSONAL KNOWLEDGE AND EXPERIENCE OF JUDGE.
    Under the latitude allowed courts of admiralty in dealing with facts relating to navigation, it is not improper for a judge to use his own knowledge of navigation and seamanship, or of the locality in question, which he had acquired by personal observation and experience, in considering and weighing evidence, and deciding cases of conflicting evidence.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in admiralty by Harris W. Baker, owner of the barge Eleanore, against the steamer J. Pierpont Morgan; the Pittsburg Steamship Company, claimant. Decree for claimant, and libelant appeals. Affirmed.

Ferris D. Stone and Miller, Smith, Canfield, Paddock & Perry, all of Detroit, Mich., and Frank S. Masten, of Cleveland, Ohio, for appellant.

George W. Cottrell and Hermon A. Kelley, both of Cleveland, Ohio, for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and McCALL, District Judge.

McCALL, District Judge. On the night of October 3, 1914, the barge Eleanore, 180 feet long, 35 feet beam, and 10 feet extreme depth, property of libelant, Baker, lay moored near a concrete crib, which was being constructed on or near the easterly margin of Livingston Channel, in the vicinity of the mouth of the Detroit river.

About 11 o'clock on the night in question, the steamer J. Pierpont Morgan, a steamer 600 feet long, 58 feet beam, and 27.4 feet depth, property of the Pittsburg Steamship Company, passed down through the channel, when the barge was torn from her moorings, went against the crib, and sank. Baker, the owner of the barge, brought this suit against the Morgan to recover for the damage wrought. The court below found that the Morgan was not, and that the Eleanore was, at fault, and dismissed the libel. Libelant appealed.

The Detroit river at this point, since the beginning of navigation, appears to have been troublesome for mariners, originally because of its shallow water and stony bottom. To remedy this condition, the government in the fall of 1912 completed an additional channel, known as the "Livingston Channel," through what was naturally shoal water. The channel is about 3 miles in length and 300 feet wide. In the fall of 1914 the government was engaged in erecting two cribs in shoal water outside of and near the eastern margin of the channel and, as respects its length, near its middle, and had contracted with the owner of the Eleanore for the services of the barge and a crew of three men during the construction of the cribs, which were intended for the placing of lights for the better marking of the easterly edge of the channel. The barge was loaded with material to be used in cement work, and on October 1st she was taken to a point where the work was to be done, and moored about 30 or 40 feet easterly of the crib, with her stern a few feet nearer thereto than the bow. It is averred that the barge was moored "in a safe and proper place, with sufficient lines and fastenings, including four anchors, with steel cables, in good holding ground; that her anchor lights were duly displayed and burning brightly, and she was plainly visible to all using those waters"; and while so moored the steamer Morgan passed down at a great and excessive speed, and produced such a suction and swell as to tear her from her moorings, and drive her violently against the crib, causing her to sink. This, it is averred, resulted from the negligence of the Morgan, her officers and crew, in the following particulars:

"(a) In not keeping a proper and sufficient lookout. (b) In navigating at an excessive rate of speed. (c) In failing to properly check her speed. (d) In neglecting to control and reduce her suction and displacement waves, while the Eleanore was within her influence and effect. (e) In failing to take such course and speed as the safety of the Eleanore required. (f) In causing said damage by her suction and displacement."

The libelee denies each of these allegations, and avers that, if the Eleanore was sunk and damaged, it was in no wise caused by the fault or negligence of the claimant or of the steamer Morgan, or those in charge of her, but was caused solely by the fault and negligence of the barge Eleanore and those in charge of her, in the following particulars:

"(1) She was in charge of incompetent and negligent officers and watch. (2) She was insufficiently and improperly moored and anchored. (3) She was improperly and insufficiently lighted. (4) She did not have steam with which to sound her whistle or to manipulate her engines and machinery. (5) She was negligently allowed to sink and become damaged after she had broken away from her moorings."

[1] The issues joined present only questions of fact which were tried to the court below. The witnesses were introduced and testified in open court, and it thus had the benefit of seeing the witnesses and hearing at first hand the testimony, covering 183 pages in the printed record. The testimony is voluminous, and a review of it here would extend the opinion beyond any reasonable length. We have given it careful consideration, and, having in mind the view expressed by Mr. Justice Greer in The Hypodame, 6 Wall. (73 U. S.) 216, 18 L. Ed. 794, that "the District Courts have better opportunities for examining such cases and forming a correct conclusion than any other," we are content to express concurrence in the finding of the District Judge to the extent that the Morgan was without fault, and are of opinion that that conclusion should not be disturbed. This being conclusive of the case, it would serve no useful purpose to review the findings respecting the negligence of the Eleanore.

[2] It is insisted that the court erred in considering his own "personal observation," in determining the strength and effect of cross-currents in the Livingston Channel. In his opinion Judge Tuttle said:

"I indicated at the beginning of this hearing my personal observation, in order that parties and counsel might know about it."

It would seem that, if counsel intended to except to his hearing and disposing of the case, because of his knowledge of the condition of the channel and the difficulty attending its navigation, obtained by his "personal observation," they should have done so at that time, and, not having done so, we think objection predicated on that ground comes too late when made by libelant for the first time on appeal.

However that may be, it is well settled that much latitude is allowed courts of admiralty in dealing with facts relating to navigation. Not only may the court itself take judicial notice of many things of which the common-law courts would require proof, but it is not bound by all the rules of evidence applied in courts of common law. Mr. Benedict, in the recent edition of his work on Admiralty Practice and Procedure (section 437), says:

"Courts of admiralty are not bound by all the rules of evidence which are applied in courts of common law, and they may, where justice requires it, take notice of matters not strictly proved, and may receive in evidence testimony which might not be admissible in other courts."

A court of admiralty also may call to its assistance men of experience in navigation, known in England as "Trinity masters," and in this country as "nautical assessors," who may sit with the court and advise with it. Judge Taft, speaking for this court in The Fountain City, 62 Fed. 87, 10 C. C. A. 278, said:

"It has been the practice in this circuit, and particularly in that court over which so experienced and able an admiralty judge as Mr. Justice Brown presided for nearly 20 years, for the District Judge to call to his assistance navigators of experience as nautical assessors. It was based on the practice, followed by the English admiralty judges, of advising with the elder brethren of Trinity House as to practical questions of seamanship and navigation. It has been approved by the Supreme Court of the United States, and it is of such long continuance that it is too late now to question its validity."

It being permissible for a judge to summon advisers, skilled in navigation and seamanship, to assist him in deciding questions arising in admiralty courts, it would not be improper, as we think, in such circumstances for a judge to use his knowledge of navigation and seamanship, which he had acquired by personal observation and experience, in considering and weighing evidence, and deciding cases of conflicting evidence. This is especially true in this case, since the knowledge the trial judge had of the Livingston Channel and its navigation, as stated in his opinion, is in accord with much of the testimony of witnesses pertaining to the same question, and we are satisfied that the trial court was not unduly nor erroneously influenced by its knowledge of the situation obtained by "personal observation."

We think this assignment, as well as others which we have considered, are without merit.

Affirmed, with costs.