## THE HYGRADE NO. 18.

### Petitions of PETROLEUM TANK BARGES, Inc., et al.

### No. 779 Admiralty.

District Court, S. D. Massachusetts.
Sept. 30, 1941.

Foley & Martin, of New York City, and Frederick Foster, of Boston, Mass., for petitioners.

Arthur J. Santry and Putnam, Bell, Dutch & Santry, all of Boston, Mass., and Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, for owner of steamship Elwood.

Albert T. Gould and Bingham, Dana & Gould, all of Boston, Mass., and Bigham, Englar, Jones & Houston, of New York City, for Shell Union Oil Corporation.

Nichols, Boyer & Morton, of Boston, Mass., for Geo. W. Perry.

FORD, District Judge.

This is a proceeding by Petroleum Tank Barges, Inc., as owner, and Tank Barge Hygrade, Inc., as charterer of the Tank Barge "Hygrade No. 18" (hereinafter referred to as the "Hygrade") for limitation of and exoneration from liability. Claims have been filed by Chas. Kurz & Co. Inc., owner of the steamship "Elwood" (hereinafter called the "Elwood"), and others.

The claimants answered to the effect that a fire which caused the damage for which recovery is sought in this case resulted from negligence on the part of the petitioners. All claimants in open court agreed that the petitioners, because of lack of personal privity or knowledge, are entitled to a decree for limitation of liability. The only remaining question is whether the fire which caused the damage for which the claims have been filed was attributable to negligence of the agents of the petitioners.

### Findings of Fact.

On May 25, 1938, the "Hygrade" and the "Elwood" were lying at the docks of the Shell Union Oil Corporation, Fall River, Massachusetts, when a gasolene fire occurred damaging both vessels, the "Elwood" suffering by far the greater. The cargo of the "Elwood", owned by the claimant, Shell Union Oil Corporation, was practically destroyed. The fire started and spread over a wide area almost instantaneously. A claimant, George W. Perry, who was operating a motor boat in the Taunton River adjacent the docks of the Shell Corporation, was badly injured and his motor boat considerably damaged.

Just prior to the outbreak of the fire the "Elwood" had been engaged in unloading its cargo of gasolene. Due to negligence on the part of the crew of the "Elwood" a large quantity of gasolene was spilled over the surface of the waters adjacent to her and its fumes filled the surrounding air. From some cause, this highly inflammable substance became ignited.

At the time of the disaster, the vessels were lying at the same dock, stern to stern, about 225 feet apart, the "Elwood" facing northeasterly and the "Hygrade" facing southwesterly. Two other vessels, the "Irene Allen" and the tug "Carmelite", were anchored in an inner dock southwesterly of the approach leading from the in-

ner to the outer dock, which approach connected with the outer dock at a point approximately halfway between the stern of the "Hygrade" and the stern of the "Elwood".

It is the contention of the claimants that the fire started from a spark in the cabin of the "Hygrade" and the ignition was caused by the negligence of the "Hygrade's" agents.

To establish the fact that the source of ignition was a spark in the "Hygrade's" cabin the claimants produced testimony that an examination, a day or two after the fire, disclosed, as they claimed, several possible sources of ignition, of the following character: An unlighted cigarette half consumed upon the floor of the galley; an electric fan; and a kerosene stove, which was not shown to have been lighted before the fire occurred, although an abortive attempt was made to do so. There was further testimony that a possible source of ignition was several bare radio wires which ran from a radio in the cabin to a wall plug. However, the master (tankerman in charge), who unquestionably knew the radio equipment, testified that the wires were insulated and I find the latter fact to be true.

In order to prove that the fire started in the "Hygrade's" cabin, the claimants produced several witnesses who testified they saw the beginning of the fire and, seeing it, at once turned from the fire and ran for their lives along the dock. Five of these were members of the crew of the "Irene Allen" and on her at the time they observed what they testified was the beginning of the fire. Other eyewitnesses, produced by the claimants, were on the dock in varying distances from 100 feet to 300 feet away in a northeasterly direction from the "Hygrade". The "Irene Allen" was about 100 feet away from the "Hygrade" and in a southeasterly direction from it. None of the members of the crew of the "Irene Allen" could see the offshore or starboard side of the "Hygrade" but had a more or less clear view of the "Hygrade's" port side. One member of the crew of the "Irene Allen" stated that the first flash of fire he saw was at the doorway in the center of the "Hygrade's" cabin located on its stern; others saw the fire for the first time on top of the cabin; another testified he first saw the flames above the dock, at the "Hygrade's" stern; and another testified he heard a small explosion and saw a sheet

of flame leaving the "Hygrade" and going toward the stern of the "Elwood". One or two other witnesses on the dock, testifying for the claimants, stated that they saw flames come out of the "Hygrade's" cabin door. Perry, one of the claimants and called as a witness for them, who was operating a motor boat on the river as stated above, testified that as he approached the pier and abreast the "Hygrade" he noticed smoke on the "Elwood" and in a very short space of time after that saw "a flame start to trickle down her side". He also testified he saw no fire in the vicinity of the stern of the "Hygrade" at that time. The petitioners called several witnesses, two of whom stood on the dock at the time they first saw the fire. These witnesses and several others, who were working on a smokestack some distance away and who had a plain view of the dock and surrounding vessels, all testified that they noticed a puff of smoke on the water between the "Hygrade" and the "Elwood" and that fire immediately spread toward both the "Elwood" and the "Hygrade". A Mr. Rothwell, called by the claimants, superintendent of the Shell Union Oil Corporation, one of the claimants, testified that he heard a dull explosion behind him as he walked on the dock in a direction away from the "Hygrade", turned around immediately and saw the river all aflame.

None of the "Elwood's" crew testified. I mention this in view of the fact no evidence sought to account for their absence and it does not seem possible that no member of that crew knew anything about the fire. There was no evidence as to whether or not these men were not available to the petitioners.

The cabin of the "Hygrade", where it is claimed the fire started, was located at its stern and was divided into two compartments, a galley and sleeping quarters. The latter were on the starboard side. In the sleeping quarters, among other things, were two sets of bunks two tiers high, and an electric fan. In the galley there was a kerosene stove in one corner, with a cupboard and sink alongside, a refrigerator, a table and radio.

A day or two after the fire an inspection of this cabin was made by marine engineers representing both the "Hygrade" and the "Elwood", together with others representing the public authorities. There was no very great variance in their testimony as to the extent of the damage caused to the "Hygrade". The experts for both agreed that

there was absolutely no evidence of any explosion having taken place within the cabin of the "Hygrade". The heaviest fire damage was to the upper inboard berth and panelling located on the starboard half of the cabin. The mattress of this berth was practically destroyed. The door between the sleeping quarters and the galley was hinged on the forward side and opened against the end of the berth. The starboard side of the door—the side which would be in the sleeping quarters when the door was closed—was heavily burned at the top. There was no fire damage in the galley. The port light on the inward side of the starboard half of the cabin, where the sleeping quarters are, was open when the "Hygrade" was inspected by the expert for the petitioners immediately after the disaster. It was hinged on the outboard side and the side which was inboard and which, normally, when the port light was closed, would be on the outside of the cabin, was smoked and slightly blistered. The back of the port light, that portion which normally would be on the inside when the port light was closed, had nothing wrong with it. The evidence further showed that practically all the damage done to a signal mast forward, a windlass cover, a gasolene cover, gear, and other small parts of the vessel was on their starboard side.

The master (chief tankerman) of the "Hygrade" stated that when he first noticed the unusual gasolene fumes, he left the cabin of the "Hygrade" where he was resting at the time, and went over to the tug "Carmelite" to determine when she would be ready to take the "Hygrade" out. He stated, and I find it to be a fact, that when he left the vessel at this time, which was within fifteen minutes before the fire broke out, the port holes on the stern and starboard side of the cabin were closed and the port hole on the forward side of the cabin was open.

Expert evidence presented by the petitioners showed that when gasolene fumes are ignited a flame travels at a very rapid rate. Under average conditions it travels at a rate of about 100 feet a second in all directions. There is no evidence presented here to show that any extraordinary conditions as to wind or heat of the water prevailed on the day of the disaster which, the evidence showed, would have a tendency to affect the ordinary speed of gasolene flame travel. The evidence further showed, as is perfectly obvious, that be-

cause of the extreme inflammability of gasolene, a spark from most any source, as for instance, one from a man's knife on a stone, or from the backfire of an automobile or motor boat, or other similar source, would cause the gasolene present under the circumstances in this case to ignite. Further, the proof showed that if the ignition took place in the cabin of the "Hygrade", in view of the probable concentration of gasolene vapors in the air of the cabin, an explosion would have taken place and the results of the explosion would be seen in the buckled or burst steel plates of the cabin.

### Opinion.

In the light of these facts, was the "Hygrade" guilty of negligence? The burden to prove this is, of course, upon the claimants. The John H. Starin, 2 Cir., 191 F. 800; The Suduffco, D.C., 33 F.2d 775; The Linseed King, D.C., 24 F.2d 967, 970.

As the claimants argue, it is fundamental in their case to prove that the fire began on the "Hygrade". But did it? There was no direct testimony that it did and I cannot bring myself to believe that such a happening is fairly inferable from the evidence adduced. This case was tried in a complete fashion, all sources of evidence were completely explored by the parties, and I cannot bring myself to find by a fair preponderance of evidence that the fire started aboard the "Hygrade". To be sure, the claimants' witnesses stated they first saw the fire over or at the door of "Hygrade's" cabin. That is easily understood without this circumstance justifying a conclusion the fire started at that point. The witnesses aboard the "Irene Allen" could not see the waters beyond the "Hygrade's" starboard. When the rapidity with which this fire travelled is considered, not one of this crew could properly testify, nor did anyone attempt to with any degree of certainty, that the course of the fire was not inboard from the "Hygrade's" starboard side. According to the experts, the area between the "Hygrade" and the "Elwood" was all aflame in about two seconds. Even if the claimants' witnesses were waiting for a fire to start with their eyes fixed on the "Hygrade's" stern, it is extremely doubtful that they could testify with reliable certainty concerning the point of beginning considering the rapidity with which fires of this nature start and spread. The flames of this fire travelled with such speed it was almost impossible for the human eye, with one look, to detect where the flames started. It will be remembered that all the witnesses on the "Irene Allen", on whom the claimants depend so much, took one look and immediately ran for their lives. The inability of witnesses, under the circumstances in this case, to determine the exact point of the fire's beginning, is further indicated by the varying points of beginning described by the witnesses on both sides, all of whom were doing their best to tell it as they saw it. The evidence concerning the starting point of the fire merely left one in confusion as to the exact starting point. It is my impression and belief that no human being who saw the beginning of that fire could tell just where it started.

The claimants contend that the burning that was evidenced in the cabin of the "Hygrade" justifies the inference it started there. Not at all. It might have started elsewhere on the waters and spread into the cabin through the open port hole at the rear of the cabin. In fact, all the burning on the "Hygrade" which was seen on the starboard side indicated the fire very well could have swept inboard from the waters on the starboard side, then through the forward port hole of the cabin onto the bunk that was so badly burned, and out the door in the center of the cabin rear. This would be perfectly consistent with the fact that most of the claimants' witnesses saw the fire for the first time over the cabin. It is reasonable to suppose also, in the absence of an explosion in the cabin, that it did not start there. Under the conditions, it seems an explosion would occur if that was the case.

The claimants further contend that possible causes of the fire were present in the cabin of the "Hygrade"—the electric fan, stove, radio wires, and a cigarette. Certainly, if sparks came from any of these, there would be an adequate cause. However, there is a wide gulf between what might have caused a fire and what did cause it. These objects might have caused the fire, but the record is devoid of any evidence to show that they did, and there was no evidence concerning any defective condition of any of these objects from which it could be fairly inferred that the spark came from them. Usually, although no evidence was introduced concerning it, these objects do not ordinarily cause sparks to be emitted when there is no evidence they are in a defective condition. Consequent-

ly, if we assume the fire started aboard the "Hygrade", there is no evidence it was caused from any negligent act in connection with the objects enumerated above for which the "Hygrade" could be held responsible. It may be pointed out the cigarette was found in the galley and was unlighted. There was no evidence how long this cigarette had been there; who had smoked it or that it had been in a lighted condition at any time gasolene fumes were present in the cabin. If this caused the fire, there is hardly any question that it would have been consumed completely. Consequently, this should be eliminated at once. The stove was unlighted at the time of the fire. No defective condition in the motor of the electric fan or radio wires was shown from which it might be fairly inferred that the spark came from these objects. The claimants, in their contentions, make various suggestions as to how the fire might have started, but when we look for evidence to hinge a finding that there was a cause for the fire due to a negligent act on the part of the "Hygrade", we find none. It is elementary that if the evidence does not go beyond mere conjecture, there is no basis for a finding of negligence.

■ The claimants further argue, assuming the court will find the fire started on the "Hygrade", it would be reasonably inferable it started through some negligent act of the "Hygrade" even though they cannot point their finger at specific acts of negligence. This suggests the application of the doctrine of res ipsa loquitur. It was assumed by all parties in this case that a spark caused this fire. A spark from where? There are so many sources from which a spark might come without any negligence on the part of the "Hygrade" that it appears plain the claimants have not excluded all other probable sources for the cause of the spark than the one upon which the negligence of the "Hygrade" may be predicated. And while it may not be necessary to exclude every possibility that the fire might have originated from some cause other than the negligence of the petitioners, the claimants are bound to introduce evidence enough to remove the probable causes from which it might have started. The claimants are left in the position of not excluding accidental and outside agencies as the source of the spark over which the pe-

titioners have no control, even if we assume for purposes of discussion the fire started aboard the "Hygrade". The doctrine of res ipsa loquitur does not apply if there is any other reasonable or probable cause from which it might be inferred there was no negligence. Wilson v. Colonial Air Transport, Inc., 278 Mass. 420, 180 N.E. 212, 83 A.L.R. 329. It is common knowledge, and an expert in this case stated, that sparks come from many accidental sources. The forward port hole and the cabin door were open, affording ready access for sparks from outside sources. In addition, the "Hygrade" was a steel barge and accidental sparks easily might have arisen from the metal. There were many people upon the pier in close vicinity to the "Hygrade". There was at least one motor boat on the waters. Several conjectures may be indulged in as to the cause of the fire, none of which are attributable to any defect in the electric fan and other objects in the cabin. Cf. Mucha v. Northeastern Crushed Stone Co., Inc., 307 Mass. 592, 30 N.E.2d 870. In many cases, the facts of which are far more favorable to support an application of the doctrine of res ipsa loquitur and where an oil fire occurred, the court has refused to apply the doctrine where it could not either by expert evidence or by common knowledge find that the mere occurrence of the accident showed negligence as the cause. Roscigno v. Colonial Beacon Oil Co., 294 Mass. 234, 200 N.E. 883. These considerations lead to the conclusion that this is not a case where the evidence affords a reasonable inference of negligence on the part of the petitioners. In other words, the doctrine of res ipsa loquitur is not applicable here.

The absence of the tankerman in charge of the "Hygrade" at the time of the fire is not discussed because this temporary absence under the circumstances here in no way bears a causal connection to the disaster.

### Conclusions of Law.

■ The claimants have failed to sustain the burden of proving the ignition of the gasolene, spread upon the waters by the negligence of the "Elwood", was caused by any negligence on the part of the petitioners. Consequently, the petitioners are entitled to a decree for exoneration from liability.