## THE KNOXVILLE CITY.
## THE ARKANSAN.

### ISTHMIAN S. S. CO. et al. v. AMERICAN-HAWAIIAN S. S CO., and two other cases.

### No. 9157.

Circuit Court of Appeals, Ninth Circuit.

April 12, 1940.

Rehearing Denied June 3, 1940.

Farnham P. Griffiths, of San Francisco, Cal., Harold A. Black and McCutchen, Olney, Mannon & Greene, all of Los Angeles, Cal., and Walter Shelton, of San Francisco, Cal., for Isthmian S. S. Co. and United States Fidelity & Guaranty Co.

Frederick W. Dorr, Archie M. Stevenson, and Dorr & Stevenson, all of San Francisco, Cal., for American-Hawaiian S. S. Co.

Ira S. Lillick, John C. McHose, James L. Adams, and Lillick, McHose & Adams, all of Los Angeles, Cal., for Aiken Country Stores, Allen Mill Store, and others.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is a proceeding in admiralty in which are consolidated appeals from three decrees all based on a holding that the steamer Knoxville City was solely in fault for a collision with the steamer Arkansan. The collision was the result of maneuvers by the Knoxville City in navigating from her anchorage in the outer harbor of San Pedro to proceed to sea through the westerly opening of the San Pedro jetty and by the Arkansan which was steaming to pass through the opening to enter the harbor. The colliding point was inside the harbor to the northerly of the opening.

The Isthmian Steamship Company, owner of the Knoxville City, has three appeals, one from an interlocutory decree in favor of the American-Hawaiian Steamship Company, owner of the Arkansan; one from a final decree dismissing its libel against the Arkansan; and a third from an interlocutory decree in favor of libelants Aiken Country Stores and others owning cargo on the Arkansan, for its damage as a result of the collision. The only questions raised by the appeals are concerning claimed errors in navigation on the part of each of the steamers.

The testimony was given in part at the hearing and in part by depositions. The depositions exceeded the number of viva voce witnesses, but the two principal witnesses, the captains on each steamship, were heard by the court.

The master of the Knoxville City in his testimony at the inquiry before the federal investigating body, the "B" board of the United States Steamship Inspection Service, gave an account of ship movements just before the collision highly favorable to his vessel. Their detail and significance are later considered. None of these movements occurred, as was shown by the Knox-

ville City's Sperry gyroscope recorder. His second officer then on the bridge testified before the B board to the identical non-existent maneuvers. Likewise did the helmsman both as to the orders given to him and executed by him. Other testimony before the B board fitted into the helpful misrepresentation. Obviously, such conduct throws doubt upon all the ship's nonmechanical records. There is no suggestion that any proctor participated in what occurred before the inspectors.

In the district court the proctors for the Knoxville City, faced with the alternative embarrassments, not infrequent in admiralty practice,[1] of the strong inferences against the ship if those concerned in her navigation are not produced and of offering witnesses who have so testified in the federal administrative proceeding investigating the collision, chose the latter course. They attempted to show by other testimony that the claimed actual maneuvers, some of which her officers had misrepresented to the inspectors, demonstrated that the Arkansan was solely in fault.

We feel that the lower court was fully justified in rejecting the contentions of the witnesses from the Knoxville City. It considered the other evidence and properly accepted as true the testimony it heard from the captain of the Arkansan. This finds support in the Arkansan's log and in other viva voce testimony from witnesses not connected with either vessel, though differing from the testimony of other such witnesses.

The Knoxville City had been at anchor in the port of San Pedro at one of the anchorages for commercial and naval vessels inside its jetty. The jetty lies on a line approximately from southwesterly to northeasterly. Its entrance is 1,800 feet wide with a lighthouse on the westerly end of the opening and a red buoy on its easterly end. There are navigable water and anchorages on both sides of the entrance. It appears from her proctors' brief that the Knoxville City lay at anchor slightly north of west from the lighthouse which was about 1,500 yards distant. Between her and the lighthouse were anchored two naval vessels, pointing northerly, between 800 and 1,000 yards, and a British merchant steamer Dolius, also pointing northerly, about 600 yards from the lighthouse. The Dolius' bow, which the Knoxville

[1] Cf. The Ernest H. Meyer, 9 Cir., 84 F.2d 496, 501.

City would have to round to pass out of the harbor in her westerly half of the entrance, was at least 600 yards from a vertical line drawn northerly from the center of the entrance.

The curving maneuver in rounding the bow of the Dolius and from there southerly to and out through the westerly half of the entrance was a simple one for the Knoxville City, her master testifying she was easy to navigate and that he could have taken her through 100 feet of the 900 feet of his western part of the entrance. From her proctors' brief it appears that at a moderate speed there was no need for the Knoxville City at any time to enter water easterly of the perpendicular line to the jetty from the center of the entrance.

We agree with and accept as sustained by the weight of the evidence the district court's findings that the collision occurred inside and easterly of the center of the entrance, after the Arkansan had passed through the easterly and, to her, the right-hand half of the entrance, on a course approximately north and at right angles to the jetty and that she had been maintaining that general course for about six minutes.

On the 19th of September, 1937, at about 4:50 a. m., a clear morning with plain visibility for several miles, the Knoxville City weighed anchor and maneuvered to proceed past the three other vessels. At 5:04, when she was headed nearly east, 82 degrees true by her gyro compass, her engines were put at full speed ahead and continued at full speed for seven minutes. In this time the captain claims she would attain a speed of 11 knots. The full speed ahead was attained just before she reached a position past the last anchored vessel and to the northerly of the lighthouse. It was also claimed that this full speed was not attained in this particular seven minutes, but the 8 knots admitted, which would require four minutes for her reversing turbines to bring her to a stop in the water, was excessive for the conditions prevailing.

The harbor of San Pedro has a very large number of in and out passages of steamships and fishing boats through the jetty's entrance. Nevertheless the Knoxville City attempted to steam towards it without a lookout. One had been stationed on the forecastle head but he had been called away to work elsewhere. There remained the chief officer waiting orders from the bridge with regard to the anchors. These may well have been required to be dropped in view of the presence near the harbor entrance of vessels of the San Pedro fishing fleet, two of which furnished witnesses at the hearing.

■ Such an officer with such a duty is not a "free and singleminded lookout." The Koyei Maru, 9 Cir., 96 F.2d 652, 654. The rule in The Ariadne, 13 Wall. 475, 80 U.S. 475, 479, 20 L.Ed. 542, applies. With a full speed in approaching the entrance on a course requiring a right-angle turn, the Knoxville City has not "vindicated herself" by conclusive testimony that the violation of the lookout requirement did not contribute causatively to the collision. There was more than a doubt as to whether there was such causation. Though the Arkansan's lights were visible at several miles distance he did not see them until two minutes before the collision and then after they had been seen from the bridge. The Knoxville City's full speeded engines were stopped, but too late, for her momentum carried her to the east of the center line of the entrance where the collision occurred.

■ The combination of the excessive speed of and lack of lookout on the Knoxville City constituted reckless navigation and, in view of the Arkansan's navigation, a major fault in the causes contributing to the collision.

■ With regard to the Knoxville City's sustaining her burden of proof of the claims of fault in the navigation of the Arkansan, these must be considered with reference to the peculiar circumstances prevailing as determining the propriety of the conduct of the respective masters. The jetty was the boundary line between the International and Inland Rules. The extended courses of the two vessels when the maneuver between them began would have crossed inside the jetty, a situation within the provisions of Article 19 of both the Inland, 33 U.S.C.A. § 204, and International, 33 U.S.C.A. § 104, Rules. They would make the Arkansan the privileged vessel, required to keep her course and speed, and the Knoxville City the burdened vessel, required to keep out of the Arkansan's way.

The jetty with its 1,800 foot entrance was a factor controlling the navigation

of both vessels and introduced another special circumstance into their maneuvers. So likewise did the fact that the Knoxville City was navigating on the other side from the Arkansan of the three vessels at anchor and the lighthouse with its bright light, all of which tended to obscure her movements to the Arkansan, constitute a special circumstance.

There were navigable water and anchorage on both sides of the entrance. As the Knoxville City proceeded from the westerly towards the entrance, the Arkansan could not be sure whether or not she was shifting to an anchorage to the easterly inside the harbor, or about to steam to sea. The courses of the two vessels actually crossed at the point of collision inside the jetty. It was a situation where it was more likely that the Knoxville City would leave port through the entrance but a ship approaching from the outside could not be certain. The situation was not like that in a narrow channel where the confining banks indicate the courses of the vessels already navigating between them and require the assumption that both vessels will confine their courses to the right-hand side under Article 25, 33 U.S.C.A. §§ 110, 210, of both sets of rules.

It is difficult to conceive a situation where Article 29 of both the Inland, 33 U.S.C.A. § 221, and International, 33 U.S. C.A. § 121, regulations, the general prudential and special circumstance rules, more clearly apply. That rule provides: "Art. 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

The Arkansan when about a mile from the jetty headed in from sea and reduced her speed from half to slow so that some two minutes and a half before the collision she was proceeding at between 3 and 4 knots through the water. It was a prudent and proper speed at which to approach and pass the entrance. Likewise, her northerly heading for the red buoy on its east side on her approach to the entrance was prudent and proper. She had not observed the Knoxville City until she emerged from behind the Dolius.

There was no reason why the Arkansan should consider stopping her engines prior to this time even if she had seen the whole maneuver of the Knoxville City from raising her anchors until passing by the Dolius, when the Arkansan first saw her. The Arkansan's course and speed up to the time the Knoxville was sighted was proper and in no way caused or contributed to the collision.

When the Knoxville City was sighted it was apparent to both the Arkansan and the Knoxville City that their passing would be inside the jetty, that is, that the Arkansan would accomplish the passing maneuver on inland water governed by the Inland Rules. The Arkansan was 443 feet long and the collision occurred after her stern had cleared the breakwater. Since her speed had been between 3 and 4 knots, that is between 300 and 400 feet a minute, and dropped constantly, first under a stop engine and then a reverse, and there were but two and one-half minutes from sighting the Knoxville City to the collision, the Arkansan's bow could not have been more than 400 feet from the entrance when the Knoxville was sighted. The Arkansan was then on a straight course into the harbor and remained so until in extremis.

At this point the Arkansan blew a one-blast passing signal answered by the Knoxville City's one-blast whistle which her captain testifies came from a vessel he regarded as on a crossing course. This first set of passing signals was immediately followed by a second one-blast passing agreement, this time initiated by the Knoxville City, whose signal was answered by the Arkansan. The Arkansan must then have had her bow almost in the entrance for the passing maneuver which would be accomplished by both vessels in inland waters. The Pilot Rules for inland waters provide that the one-blast signal from the privileged vessel means she intends to keep her course:

"One short blast of the whistle signifies intention to direct course to own starboard, except when two steam vessels are approaching each other at right angles or obliquely, when it signifies intention of steam vessel which is to starboard of the other to hold course and speed." Department of Commerce—Pilot Rules, Benedict, Admiralty, 5th Ed., Vol. III, p. 569.

It is clear that, to the Knoxville City's captain, who regarded himself in

a crossing situation, *his* signal and the Arkansan's response meant he had assumed the burden of avoiding the Arkansan and that the Arkansan was required not to change her course.

█ However, the Knoxville's captain and the Knoxville City's brief contend that when the one-blast whistles were exchanged the Arkansan was not on a course vertical *to* the jetty but was running along the jetty from the *westerly* towards the lighthouse, at an acute angle ·to the jetty of about 35 degrees. This course would have made the Arkansan enter at the west of the · entrance.² . The Knoxville City's captain contends he then thought the Arkansan governed by International Rule 28 and that under this rule the one-blast whistle from .the privileged vessel required her to turn to her starboard or right and that he expected the Arkansan to turn to a course bringing her to the eastern half instead of the westerly half· of the entrance. We have agreed with the district court that we cannot accept this contention of the Knoxville City's captain.

Since the Arkansan was almost entering the easterly half of the entrance at right angles, the two exchanges of the one-blast passing signal should not have led the Knoxville City's captain to believe the Arkansan intended to turn to the right. Even if the signal · under International Rule 28, *given when both vessels are on the high seas,* should be interpreted as claimed by the Knoxville City, it was not fault in the circumstances here for the Arkansan's captain to signal and proceed on the same assumption of a crossing course under the Pilot Rules, which was indicated by the one-blast signal proposal from the Knoxville City from her inland position on a course crossing the Arkansan's inside the jetty.

² This theory of the Knoxville City's· captain would have proved beyond question the absence of fault in his vessel and the sole fault in the Arkansan, if his testimony before the B board had been true.

The Knoxville City's gyro shows a short turn of but 15 degrees to the right from a heading of 82 degrees true at the passing of the Dolius. This would make the vessel point 97 degrees true across and northerly of the entrance at about a 35 degree angle to the breakwater. The turn the officers claimed before the B board was a hard right of 70 degrees which would have made the vessel heading nearly at right angles out through the Knoxville City's right side of the entrance. This would have exonerated the captain. The non-existent "hard right" 70 degree swing would have brought the vessel to 152 degrees true. The captain there testified in detail that his vessel swung to 150 degrees true, the second officer that she swung 70 degrees which would have brought her to 152 degrees true, and the helmsman that he saw her swing *on the compass before him* to 152 degrees true.

The captain's explanation is that while in fact he turned but 15 degrees, he examined his Sperry gyro course record and, because the recording penstrokes had blurred, he mistook a 15 degree turn to the right and then a turn to the left on which the collision occurred, for a long ·continuing 70 degree right ·turn, at the end of which he turned left just before the collision. The mate testified, on deposition, on a blurred photostat copy introduced by the Knoxville City and the captain testified at the hearing below on a blurred enlargement. In both, the four movements of the recording pen had been merged into two.

On the.original Sperry recording sheet, which the officers examined before the B board hearing a few days after the collision, the red ink lines afford as clear and unblurred a record as could be asked for. It is plain to the naked eye that from 82 ·degrees true the vessel turned right to 90 degrees, the end of the recording sheet. The turn then continued on to the right (to the left on the sheet) to 97 degrees. Then the red ink shows a turn the other way, to the left, from 97 to 90, the end of the sheet, and then a continuing turn to the left (to the right on the sheet) to 28 degrees. It was on this left turn at about 79 degrees true that it is admitted the collision occurred.

·There is no mystery about these . four pen movements of the gyro record. The captain knew that, starting at 82 and turning past 90, the right hand end of the sheet, the pen turned to the left ·on the continuance of the right .turn of his ship. He knew that his ship's next turn to the left would show on the pen's turning to the right until it reached 90 degrees and that it would then trace to the left. The four pen movements, which the red ink plainly shows, could mean nothing else to any intelligent man once told the method of recording. The captain admitted he had studied the Sperry system with that company, understood it and had kept such records for 12 years.

It is apparent that all proctors below relied on ·the blurred photostats in their examination, but it was the original red ink record which the officers consulted before testifying before the B board.

The Arkansan's signals had no contributing causative relation to the collision.

However, even if both vessels had been governed by the International Rules, the one-blast whistle from the privileged Arkansan would not call for her turning to her starboard. That signal indicates a turn to starboard only when that turning is permitted by the International Rules. Such a turning is not permitted the privileged vessel which, under Articles 21 and 19, must keep her course. This is apparent from the text of Article 28 construed with Articles 21 and 19.

"Art. 28. The words 'short blast' used in this article shall mean a blast of about one second's duration.

"When vessels are in sight of one another, a steam vessel under way, *in taking any course authorized or required by these rules,* shall indicate that course by the following signals on her whistle or siren, namely:

"One short blast to mean, 'I am directing my course to starboard.' * * *" (Italics supplied). (33 U.S.C.A. § 113).

Directing the course of the Arkansan to starboard would not be "taking any course authorized or required by these rules," but, on the contrary, would be taking a course in violation of Articles 21 and 19, which provide:

"Art. 21. Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed."

"Art. 19. When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." 33 U.S.C.A. § 106, § 104.

In the following cases of collision on the high seas the privileged vessel had blown a one-blast whistle and thereafter maintain her course and was held not in fault: The Newport, D.C., 2 F.2d 255, affirmed by the Supreme Court, Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651, and Pacific Atlantic S. S. Co. v. United States, 9 Cir., 63 F.2d 414, 416. In The Delaware, 1895, 161 U.S. 459, 16 S.Ct. 516, 520, 40 L.Ed. 771, the Supreme Court considered a claimed violation of the inspectors' rules for inland waters, in the failure of the privileged vessel, which had blown a one-blast signal, to port her helm and direct her course to starboard. The court held the Inland Rules should be construed "in harmony with the international code". To keep them in that harmony the inspectors' Inland Rules were interpreted as requiring the privileged vessel on blowing a one-blast signal to keep her course.

The case of The Lisbonese, 2 Cir., 53 F. 293, decided in 1892, in which one of the circuit judges dissented, holding at fault a privileged vessel on a crossing course on the high seas for not changing her course to the right after sounding a one-blast signal, is not in accord with these decisions, the last of which, The Delaware, was decided by the Supreme Court three years after The Lisbonese. The same is true of the district court decision Societe des Chargeurs v. United States, 43 F.2d 125. In neither case was considered the wording of Article 28 in connection with Articles 21 and 19 of the International Rules. Incidentally, it is apparent that these cases have no bearing on the specific problem here of a maneuver for crossing in inland waters where the privileged vessel is just entering them.

Even if the Arkansan's signal and continuance on her course could be construed in the special circumstances as a fault, it was a minor fault and, if we had considered there was any doubt as to its contribution, we should have resolved it in her favor in view of the reckless navigation of the Knoxville City, with her absence of lookout and excessive speed. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L. Ed. 84.

In these appeals no fault was claimed as to the Arkansan's stopping her engines 1½ minutes before the collision when the Knoxville City was seen approaching at a high rate of speed on a crossing course or in her reversing a half minute later, on the ground that the Arkansan sooner should have stopped and reversed. On the contrary, it is contended that the Arkansan, as the privileged vessel, *should have kept her course and speed* for a much longer time in the short period after she discovered the speed and course of the oncoming Knoxville City. Nothing could better disclose the *in extremis* navigation the Knoxville City imposed on the Arkansan's captain than the contrary contention of the insurance companies' proctors, also arguing against the Arkansan at the same hearing, that the Arkansan *should have reversed at once instead of stopping*

*engines for a half minute and later reversing.*

If able proctors, whose experience in collision litigation is shown in scores of reported cases, so disagree, it is not possible for any one, navigating at bench or office desk, to say of the captain of the Arkansan that the wrongful conduct of the Knoxville City had not forced him, in that last 1½ minutes, to make the best hurried judgment of which he was capable to prevent injury to or loss of his vessel. We hold that the Arkansan was in extremis when her stop engine order was given.

Decrees affirmed, with costs to the appellee.

HEALY, Circuit Judge, concurs in the result.