**MORAN TOWING & TRANSPORTATION CO., Inc., Libellant-Appellee,**

v.

**CONNERS–STANDARD MARINE CORP., Respondent-Appellant.**

No. 76, Docket No. 26216.

United States Court of Appeals
Second Circuit.

Argued Nov. 4, 1960.

Decided Dec. 21, 1960.

Rehearing Denied Jan. 25, 1961.

 

Robert A. Feltner, New York City (Eugene Underwood and Burlingham, Hupper & Kennedy, New York City, on the brief), for libellant-appellee.

Vincent A. Catoggio, New York City (Purdy, Lamb & Catoggio, New York City, on the brief), for respondent-appellant.

Before SWAN, CLARK and MEDINA, Circuit Judges.

MEDINA, Circuit Judge.

Conners-Standard Marine Corp., owner of the tug Gramercy, appeals from an interlocutory decree holding the Gramercy solely to blame for damage caused to the barge C. L. Stillman, owned by the assignor of libellant Moran Towing & Transportation Co., Inc., and towed push-boat fashion by the Moran tug Harriet Moran, when the Gramercy and her two-barge tow crowded the Moran flotilla off the channel and aground in the New York State Barge Canal. The opinion below is not reported.

At about 1:55 p. m. on June 6, 1956, "a fair, clear, beautiful, sunshiny day," in the Mohawk River section of the New York State Barge Canal, two flotillas approached one another on the opposite sides of a 90° S-bend surrounded by high land. The tug Harriet Moran, operated by libellant Moran Towing & Transportation Co., Inc., had in tow, push-boat fashion, the steel barge C. L. Stillman, owned by Moran's assignor, and fully loaded. The Harriet Moran is a 1,000 horse powered single screw, steel vessel, 89.4 feet long, and 25.2 feet abeam. Her diesel power was operated electrically from her pilot house, which was, at the time of the grounding hereafter referred to, hydraulically lifted to a height of about 21 feet above the water line, giving a clear and unobstructed view ahead.

The C. L. Stillman is a steel barge, 211.1 feet long and 42.9 feet abeam, of 1,508 gross and net registered tonnage. The Gramercy, with 150 horsepower, was also single screw, 63.8 feet in length, 18.8 feet abeam and a tonnage of 64 gross, 43 net tons. She was towing two wooden barges tandem, one loaded, one light, on two hawsers 70 feet in length, both running from the stern bitts of the tug to the forward port and starboard corners of the lead barge. The two barges were fastened together by another double line possibly one or two feet long. These barges were not equipped with any steering apparatus. One of the witnesses estimated the length of the Gramercy flotilla as about 290 feet.

The current was not a factor in the case, but what little there was of it favored the Moran flotilla. When this flotilla passed the railroad bridge about three-quarters of a mile from the place of grounding, Captain Perry cut his engine down to one-half speed or five statute miles per hour over the ground, and he sounded one long blast as the required bend signal. The Gramercy flotilla approached from the opposite direction at three miles per hour and it sounded no bend signal. As it was impossible to see around the bend this was a statutory fault, in violation of the Inland Rules, Article 18, Rule V, 33 U.S.C.A. § 203, which provides as follows:

"Whenever a steam vessel is nearing a short bend or curve in the channel, where, from the height of the banks or other cause, a steam vessel approaching from the opposite direction cannot be seen for a distance of half a mile, such steam vessel, when she shall have arrived within half a mile of such curve or bend shall give a signal by one long blast of the steam whistle * * *."

As the Moran flotilla reached the bend at the stake light marked 163 on the chart (Libellant's Exhibit 2A) the two flotillas first came in sight of one another and they were then between 1,000 and 1,500 feet apart, as found by the trial judge. At about that time the Gramercy

sounded one blast for a port to port passage and the Harriet Moran responded with one blast. Captain Perry then checked down his speed "a little more." He did not lower his speed further, nor did he put his engine in reverse, and at the time of the grounding was making from 4 to 5 statute miles over the ground as found by the trial judge. Neither tug at any time sounded the danger signal.

While the Gramercy flotilla was to some extent on the wrong side of the channel when it was first observed by Captain Perry, there is no testimony that it was then "three-quarters of the way over in the channel on her port side," as found by the court. But she was on the wrong side of the channel and this was another statutory fault (Inland Rules, Article 25, 33 U.S.C.A. § 210). Despite all this, there would still have been room in the 300 foot channel for the flotillas to pass one another in safety had not the mate of the Gramercy, who was at the wheel, suddenly decided to do the one thing that could not fail to produce an increasingly perilous situation. He made a sharp turn to starboard. This threw the stern of the Gramercy to port and swung the two barges out into the path of the oncoming Moran flotilla. No one can tell precisely what was the distance separating the two flotillas when this maneuver was undertaken; they were not far apart. It is clear to us that it would have done no good had the Harriet Moran sounded the danger signal, and, in view of the momentum of the Moran flotilla, that further cutting down speed or stopping the engine entirely would have been of no avail, as the flotillas were so near to one another. To have reversed would have increased the probability of collision, as this could have thrown the stern of the Harriet Moran to her port and closer to the Gramercy flotilla, because the Harriet Moran was a single screw vessel.

■ The gist of the case is that the swinging of these barges directly in the path of the Moran flotilla was a gross fault and it was the sole proximate cause of the damage to the C. L. Stillman. Even the mate of the Gramercy admitted there was a swing to his left, although he insisted that there was at least 100 feet of open water between the two flotillas when the C. L. Stillman grounded. The difficulty with this is that Judge Murphy believed the Moran witnesses who testified that when the Gramercy passed there was a clearance of only 30 to 35 feet, which was reduced to 20 when the first barge went by, and to only 7 or 8 feet, or so near that a man could almost jump aboard as the second barge passed. Captain Perry testified that he veered off to starboard more and more as the Gramercy flotilla came closer and closer in order to avoid a collision, and that is how he was forced off the channel into shallow water where the C. L. Stillman momentarily grounded and sustained the damage complained of. While it is suggested that had Captain Perry stopped his engine the damage caused by the grounding might have been less, we think this is mere conjecture. The speed of 4 to 5 statute miles per hour could scarcely have become much less in the course of a few hundred feet, and it is a more likely inference that the C. L. Stillman would have gone on and over the shallow place where she struck, and have sustained precisely the same damage, even if Captain Perry had shut off his engine as soon as he became aware of the Gramercy's turn to starboard. We think the findings that the Gramercy was at fault and the Harriet Moran was not are supported by the proof. The last clear chance doctrine is obviously inapplicable to the state of facts we have just described.

It is vigorously contended that the Harriet Moran was at fault because she had no lookout. Surprisingly enough, this argument is made although Elmer Bicknell, the mate of the C. L. Stillman, was in the bow of the barge as it approached the bend, and he signalled to Captain Perry the presence of the Gramercy flotilla as soon as it hove in sight.

Counsel argues that, even if he performed the duties of a lookout, we must hold the Harriet Moran at fault for failure to provide a lookout, as Bicknell was not hired by Moran nor had he been instructed to act as a lookout. He testified that he was bracing the dogs on the hatches and that when he heard Captain Perry sound the bend signal he dropped his work, looked up ahead and that when he saw the Gramercy flotilla he signalled back to Captain Perry that something was coming. Captain Perry testified that immediately after he saw Bicknell's signal he heard the single blast of the Gramercy for a port to port passage and, as the Gramercy then came into view, he answered the Gramercy's signal with a single blast of his own.

█ It is quite true that the mere · presence of someone on the bow of a vessel does not satisfy the rule of 33 U.S.C.A. § 221 that nothing in the Inland Rules shall exonerate any vessel for "any neglect to keep a proper lookout." [1] Perhaps the Harriet Moran was at least guilty of a technical fault sufficient to bring into play the strict rule of The Pennsylvania, 1874, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148. Even so, if it were clearly established that Bicknell was an experienced lookout, that he knew just what the duties of a lookout were, and that he performed these duties, it would be difficult to reach the conclusion that the failure "to keep a proper lookout" in any way contributed to or was a proximate cause of the damage to the C. L.

Stillman. But we do not reach this point because, as already above stated, the sole proximate cause of the grounding was the sharp turn to starboard by the Gramercy, and this maneuver was undertaken after the flotillas were in full view of one another and after the time had passed when the duties of the lookout were to be performed. In other words, had the Gramercy simply shaped her course slightly to starboard or even kept on her original course there was room in the channel for the flotillas to pass one another in safety. With these facts in mind, and applying the rule of The Pennsylvania in all its rigor, we are bound to conclude that on no state of facts consistent with the evidence was the failure "to keep a proper lookout" a proximate cause of the damage.

Another argument by appellant is that the trial judge refused to permit an oral summation at the close of the evidence and refused to allow time for the submission of a typewritten brief. But the trial transcript reveals no clear request for an opportunity to make an oral argument after both sides had rested.[2]

█ One of the basic requirements of a fair trial is the right to be heard. A litigant is deprived of this right if his counsel is not afforded an opportunity to inform the court of the reasons why the case should be decided in his favor. On the other hand, such is now the congestion of the courts, and such is the prejudice to thousands of litigants by reason of delays in the administration

1. See The Ariadne, 1871, 13 Wall. 475, 80 U.S. 475, 20 L.Ed. 542; Poling Russell, Inc. v. United States, 2 Cir., 1952, 196 F.2d 939; Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 1928, 26 F.2d 603; The Knoxville City, 9 Cir., 1940, 112 F.2d 223; Smith v. Bacon, 5 Cir., 1952, 194 F.2d 203; United States v. The Holland, D.C.D.Md.1957, 151 F. Supp. 772.

2. The colloquy between the trial judge and counsel at the close of the evidence was as follows:

"Mr. Catoggio: Does your Honor care for—

"The Court: No, indeed. I am within minutes of dictating an opinion now, but I won't.

"Mr. Catoggio: Does your Honor care to have my views on it?

"The Court: You want to write a brief, do you mean?

"Mr. Catoggio: I would like to get my views across to your Honor, whichever way is easiest.

"The Court: I have one brief from the libelant which he gave me before the case started.

"Mr. Catoggio: Well, I haven't had a chance to hand to your Honor chart 2A.

"The Court: I will receive all the exhibits, counsel. Decision reserved."

of justice, that every proper means must be availed of to speed up the process of trying and deciding cases. Courtesies to counsel smooth the path of justice and there are occasions when a trial judge may well be inclined to indulge counsel and even allow a few weeks or months to write and file briefs. There is, of course, no rule of thumb; everything is relative; in deciding whether or not there has been an abuse of discretion in giving directions with respect to the filing of briefs the decisive factors are the kind of a case one is dealing with and the maintenance of the authority and power of the trial judge to control the proceedings. In a simple non-jury case like the one now before us the issues of which depend on a mere question of credibility, and the inferences to be drawn from the facts as found, we do not see anything to prevent the trial judge from deciding the case forthwith, as soon as both sides have rested, in the absence of an unambiguous request for some reasonable opportunity to present orally the reasons why counsel thinks the case should be decided in his favor.

If the trial judge wishes to dictate his opinion and findings at once, there is no reason why he should not do so, and many reasons why he should. If time is allowed to counsel for the filing of briefs, they will want time to reply after the briefs have been filed; and the net result more often than not will be that the trial judge will, by the time the briefs are all finally filed, have forgotten many of the details that were fresh in his mind when the case was being tried. We have already approved the practice of promptly deciding non-jury cases, especially in admiralty. Polarus Steamship Co. v. The T/S Sandefjord, 2 Cir., 1956, 236 F.2d 270, 272.

Affirmed.

On Petition for Rehearing.

SWAN, Circuit Judge.

I would grant a rehearing with respect to Point VI of the petition.