**CENAC TOWING COMPANY, Inc. and Alfred Cenac Towing Company, Inc., Appellants,**

v.

**KEYSTONE SHIPPING COMPANY et al., Appellees.**

**KEYSTONE SHIPPING COMPANY, Appellant,**

v.

**CENAC TOWING COMPANY, Inc., et al., Appellees.**

**No. 25497.**

United States Court of Appeals Fifth Circuit.

Dec. 4, 1968.

George B. Matthews, Lemle, Kelleher, Kohlmeyer, Matthews, & Schumacher, New Orleans, La., for Cenac Towing Co., Inc. and Alfred Cenac Towing Co., Inc.

Benjamin W. Yancey, Alfred M. Farrell, Jr., Kaul J. M. Buhler, II, New Orleans, La., for appellees, Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., of counsel.

Before GOLDBERG and AINSWORTH, Circuit Judges, and SPEARS, District Judge.

AINSWORTH, Circuit Judge:

This is an appeal by each of three vessel owners from an interlocutory decree adjudging appellants and their respective vessels at fault and dividing damages into thirds.

On the night of April 9, 1963, the tanker PERRYVILLE, carrying a cargo of aviation gasoline, kerosene and heating oil, and proceeding seaward through the Southwest Pass in the Mississippi River, went aground on the west bank of the channel. The tanker remained stranded for nine days, causing heavy loss to her owner, Keystone Shipping Company, consisting of repair costs, transshipment of cargo, salvage and general average expenses. Keystone Shipping Company filed a libel for the damages sustained, alleging that the stranding was caused by the blocking of the channel at the mouth of Southwest Pass by a flotilla of two tugboats, the CONNIE CENAC and the CAPT. TENNER CENAC, and their tow, the barge CTCO 176, laden with 12,511 barrels of crude oil. Cenac Towing Company, Inc., owner of the tug CONNIE CENAC, and A. P. Cenac Towing Company, Inc., owner of the tug CAPT. TENNER CENAC, each filed a petition for exoneration from or limitation of liability, under 46 U.S.C. § 183 et seq. The petitions and claims were consolidated for trial on the question of liability. The District Judge entered an interlocutory decree adjudging each of the three vessels and their owners at fault.[1]

---

1. The tanker PERRYVILLE is of T–2 design, "jumboized" in 1958, 583 feet in length overall, 80 feet in beam, 45 feet in molded depth, propelled by a turbo-electric engine to a single screw with 6,000 horsepower, or a burden of 14,455 gross and 10,666 net tons.

The tug CONNIE CENAC is a documented vessel with the following register dimensions: length 60.8 feet, breadth 19.6 feet, depth 8.0 feet, 71 gross tons, 48 net tons, with horsepower of 1,000. The tug CAPT. TENNER CENAC is a documented vessel with register dimen-

The evidence sustains the findings and conclusions of the District Court. We find no error and therefore affirm.

A red blinking light is situated at the east side of Southwest Pass just below the jetties at its south end. The United States Coast Guard Station is located approximately 500 yards farther up the east side of the Pass. The Pilot Station is still farther up, approximately 1 mile from the south end. The channel in Southwest Pass runs in a general southwest direction as far as the jetties or the mouth of the Pass, at which point it bends due south, forming a dogleg turn. It was in the vicinity of this turn that the tanker PERRYVILLE went aground. The channel in the Pass was at the time of the stranding 35 feet deep, with an irregular width of approximately 600 feet. The Pass is known to be hazardous to traverse. Flanking its sides are rock jetties. Extending out from these jetties, spaced about 1,000 feet apart, are perpendicular dikes. The current runs fast and heavy during the spring of the year, straight between the jetties, and spreading out fan-shaped with greater velocity to the west at the bar or the end of the jetties seaward. A vessel plying the Pass to the Gulf of Mexico must negotiate a sharp 43-degree turn to port at the dogleg turn to get through the jetty ends. A regulation, promulgated by the United States Corps of Engineers, prohibits large vessels, including tugs with tows, from entering Southwest Pass from the Gulf when any descending vessel is within 2½ miles.[2]

On the night preceding the stranding, the tug CAPT. TENNER CENAC departed from an oil rig in the Gulf of Mexico, towing the loaded barge CTCO 176 with a stern hawser, and headed toward Southwest Pass in the Mississippi River. It reached the ends of the jetties at about 2 p.m. the following afternoon but was unable to cross the bar between the jetties to enter the Pass because of insufficient power and the force of the current. This current runs 3½ miles per hour in the Pass and accelerates to 4½ miles over the bar at the end of the jetties. After each attempt the CAPT. TENNER CENAC and its tow were pushed back and forced to hold up east and south of the red light at the end. The CAPT. TENNER CENAC radioed its owner and was informed that the tug CONNIE CENAC would proceed to lend assistance. At 7 p. m. that evening, the watch on the CAPT. TENNER CENAC changed and her captain retired to sleep, leaving in charge a relief captain, assisted by a deck hand.

In the meantime, the PERRYVILLE was heading seaward toward the upper reaches of the Pass. It exchanged pilots at Pilot Town, entered the Head of Southwest Pass at 7:28 p. m., and proceeded down the 20.2-mile run under the direction of the bar pilot, who was assisted at the bridge by the master and third officer. The night was dark but clear and the wind was from the southwest at 8 knots. At Light No. 5, which is approximately 2½ miles from the exit or mouth of the Pass, the PERRYVILLE's pilot, master and third mate saw distant lights at the end of the jetties.

The speed of the PERRYVILLE in still water was 13½ miles per hour full ahead, 6½ miles per hour half ahead, and 3½ miles per hour slow ahead. In the Pass the various speeds of the tanker

sions as follows: length 59.8 feet, breadth 19.6 feet, depth 8.0 feet, 71 gross tons, 48 net tons, with horsepower of 800.

The barge CTCO 176 is a steel tank barge, 210 feet in length, 40 feet in breadth, and 12 feet in depth.

2. Corps of Engineers Regulation 33 C. F.R. § 207.200(d) (1) provides as follows:

"*Navigation of South and Southwest Passes.*

"No vessel, except small craft and towboats and tugs without tows, shall enter either South Pass or Southwest Pass from the Gulf until after any descending vessel which has approached within two and one-half (2½) miles of the outer end of the jetties and visible to the ascending vessel shall have passed to sea."

were increased by 3½ miles, the rate of the current. At slow ahead, 7 miles per hour, the vessel would have been able to maintain steerageway. During her journey down Southwest Pass, which included several reductions in speed, the PERRYVILLE made an average 15 miles per hour.

The CONNIE CENAC arrived below the east jetty end light to assist the CAPT. TENNER CENAC. A relief captain, assisted by a deck hand, was in charge of the CONNIE CENAC. Neither tug had a lookout. The CONNIE CENAC proceeded to take in tow the other tug and its tow by swinging about to port and drifting down the current toward the bow of the CAPT. TENNER CENAC. At about this time, and when the PERRYVILLE was just above the Pilot Station, she was sighted by the relief captain of the CONNIE CENAC. Prior to this time no one aboard either tug had seen or had been aware of the PERRYVILLE. However, she had been sighted from seaward earlier by other vessels at greater distances. The CONNIE CENAC began hauling and the flotilla gathered a headway of not more than 1½ miles per hour. Neither of the two relief captains of the tugs knew of the regulation prohibiting them from entering the Pass under the existing circumstances.

When the PERRYVILLE was still upriver above and in the vicinity of the Pilot Station, her pilot, master and third mate observed the CENAC flotilla below the red light at the end of the jetties. As she reached the Pilot Station, the tanker reduced her speed to pass an upbound deep-sea tug and tow and then resumed full speed. The tow of the CENAC flotilla had tailed to the west and was almost blocking passage at the entrance to the Pass about this time. The pilot of the PERRYVILLE sensed an impending collision and communicated this fear to the master of the vessel. Grounding, in order to avert collision, was discussed, and considered by the captain to be advisable. The engine room was warned to stand by for emergency full ahead, and the vessel continued on course down the Pass for another thousand feet. In quick succession a danger signal was sounded, the engine was set at emergency full speed, and the tanker's rudder was put hard to the left. The tanker began her left swing when abeam the east jetty and red light, skirting around the flotilla and grounding itself at the westerly edge of the channel.

Based on these findings, the Trial Court found that the following acts or omissions by both tugs and the tanker constituted negligence which contributed to the stranding:

*Fault of the PERRYVILLE:*

Failure to slow down, failure to keep a proper lookout, and failure to use radar.

*Fault of the tugs:*

Violation of Corps of Engineers Regulation, 33 C.F.R. § 207.200(d) (1), prohibiting tugs with tows from entering the Southwest Pass from the Gulf until a descending vessel within 2½ miles shall have passed to sea, improper blocking of the tanker's lawful channel thereby embarrassing navigation, inadequacy of personnel evidenced by ignorance of both relief captains of the regulations governing Southwest Pass, and absence of a lookout.

The proper standards for reviewing a Trial Judge's findings were enunciated by the Supreme Court in McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954). The Court in that case said:

"In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. * * * A finding is clearly erroneous when ' "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm convic-

tion that a mistake has been committed." ' United States v. Oregon State Medical Society, 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746."

In Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776, an admiralty case, we said:

"It is well settled that in order for a reviewing court to set aside findings of fact by a trial court sitting without a jury, it must be clearly demonstrated that such findings are without adequate evidentiary support in the record, or were induced by an erroneous view of the law, and the burden of showing that the findings are clearly erroneous is on the one attacking them. The findings of a district court are not, therefore, lightly to be set aside, for the Court of Appeals is not a trier of facts, and does not substitute its own judgment for that of the trial court." [3]

■ The theory of the CENAC's defense is that the flotilla was far below the red light and south of the jetties when the PERRYVILLE arrived and consequently could not have blocked the channel and embarrassed the navigation of the PERRYVILLE; that the stranding therefore was the result of an unrelated cause. This defense, however, was not the one asserted at the trial of the case. At that time it was urged that the flotilla had already entered and was well up in the Pass when it passed the

PERRYVILLE port to port without incident. Neither of these contradictory theories is supported by the evidence. The District Judge's finding that the flotilla was blocking the channel and that as a result thereof the navigation of the PERRYVILLE was embarrassed, thereby contributing heavily to the accident, is amply supported by the evidence. This clearly constitutes actionable negligence. Moran Towing & Transp. Co. v. Conners-Standard Marine Corp., 2 Cir., 1960, 285 F.2d 368, 370, 86 A.L.R.2d 368; Deep Sea Tankers v. The Long Branch, 2 Cir., 1958, 258 F.2d 757, 766; The Express, 2 Cir., 1914, 212 F. 672, 674; The Umbria, 2 Cir., 1907, 153 F. 851, 854. It is reasonable to assume that had the relief captains in charge been aware of the pertinent regulations, or had there been lookouts on duty, the flotilla would not have placed herself in the critical area. The duty of a tug with tow to use due care also includes the duty to keep a proper lookout. "The question of a proper lookout is one of fact to be determined from all of the circumstances on the basis of common prudence." China Union Lines, Ltd. v. A. O. Andersen & Co., 5 Cir., 1966, 364 F.2d 769, 783.[4]

■ The CENAC interests argue that fault of the CONNIE CENAC is not supported by the evidence. We do not agree. The District Court correctly found from the evidence that the two tugs were part of the flotilla, that neither tug captain surrendered command to the other, and that the decision to enter the channel at the end of the jetties was the decision of each.

---

3. See also China Union Lines, Ltd. v. A. O. Andersen & Co., 5 Cir., 1966, 364 F.2d 769, 780; Atkins v. Lorentzen, 5 Cir., 1964, 328 F.2d 66, 71; Trinidad Corporation v. Indian Towing Company, 5 Cir., 1961, 293 F.2d 107, 109; National Marine Service, Inc. v. Avondale Marine Ways, Inc., 5 Cir., 1961, 287 F.2d 889.

4. Inland Rules, Art. 29, 33 U.S.C. § 221, provides in this regard as follows:
   "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or sig-

nals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."
The adequacy of a lookout is one of fact which must be resolved by considering the totality of the circumstances. Anthony v. International Paper Company, 4 Cir., 1961, 289 F.2d 574, 580. We cannot say that the District Court's findings were in error under the circumstances here.
See also Griffin on Collision § 181 at 419 (1949).

The theory of the PERRYVILLE's defense is that she had a right to continue ahead and assume that a tug with tow below the jetty ends would obey the regulations and not attempt to cross the bar in violation thereof, that when at the Pilot Station she discovered the dangerous position of the CENAC flotilla she was unable to take any action other than what she did, and that was to move out at emergency full speed. Implicit in this argument is the premise that the PERRYVILLE did not know or could not have known of the impending danger until she reached the Pilot Station. The evidence, however, is to the contrary. The testimony of the PERRYVILLE's officers reveals that at least 2½ miles above the end of the jetties, the master, pilot and third mate were aware of a tug attempting to cross the channel in or near the vicinity of the dangerous dogleg turn. Nevertheless, no precautionary measures were taken. Prudent seamanship and common sense would have dictated that the PERRYVILLE keep informed of the position of the flotilla and act accordingly until assured that there would be no hindrance to its passage. Nevertheless, the evidence is to the effect that the PERRYVILLE continued on its course without slowing down, without ascertaining or attempting to confirm the position of the CENAC tow by radar, and without later checking on the flotilla's position. Not until the danger of collision was imminent did the PERRYVILLE react to the peril, and then to its own detriment by stranding. Considering the tortuous exit of the Pass, the high seasonal current, and the volatile nature of her cargo, the failure of the PERRYVILLE to slow down or take other precautionary measures was clearly negligence. We are left with the firm conviction, as was the District Judge, that foresight and the exercise of prudent seamanship by the PERRYVILLE would have resulted in a situation free of dilemma. For the PERRYVILLE to contend that it took the most reasonable action possible under the hazardous circumstances then existing, does not excuse it for having contributed to the creation of those circumstances.[5]

Affirmed.

---

5. See Griffin on Collision § 233 et seq. (1949), where the general principles relative to errors in emergency are stated:

"Where there is danger of collision, prompt action is necessary and is expected of a navigator. Ordinarily, if the action taken is negligent or is in violation of law, the vessel is liable. But if a vessel, without her own fault, is placed in a position of sudden danger, she is not condemned if the action which she takes in the stress of the emergency proves to have been erroneous." Id., § 233 at 529.

"[A] vessel guilty of a fault which was, wholly or partly, the cause of the danger cannot avoid liability by arguing that her fault was too remote because the immediate cause of collision was an error *in extremis* made by the other vessel." Id., § 233 at 531. "A vessel which is herself to blame for the existence of the emergency cannot use it as an excuse for her own erroneous action. If her antecedent fault has caused or contributed to the danger, she cannot invoke the principle of error *in extremis*." Id., § 235 at 534.